UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Alveto Rivera, | Civil No. 12-CV-1479 (MJD/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Imo Kalla, Sara Hard, Regina Stepney, Luke DeHaan, Dr. Stanley Quanback, Sheryl Vezner, Je Lind,[1] | |
| Defendants. | |

Alveto Rivera, Pro Se.
Kelly s. Kemp, Assistant Attorney General, for Defendants Kalla, Hard and Stepney.
Charles A. Gross and Andrea P. Hoversten for Defendants DeHaan and Quanbeck.

**THIS MATTER** is before the undersigned United States Magistrate Judge on Defendants' motions for summary judgment (ECF Nos. 75 and 89). This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that the Defendants' motions be **GRANTED**.

**I. BACKGROUND**

Plaintiff Alveto Rivera is an inmate confined at the Minnesota Correctional Facility at Stillwater (MCF-STW). From March – October 2009, Rivera was confined at the Minnesota Correctional Facility at St. Cloud, Minnesota (MCF-SCL). Defendant Imo Kalla is a nurse who treated Rivera at MCF-SCL. ECF No. 20 at 2. Sara Hard and Regina Stepney are DOC employees

---

[1] Defendants Sheryl Vezner and Je Lind are retired DOC employees who previously worked in the MCF-SCL mail room. ECF No. 20 at 2. Neither were served and thus they will not be addressed in this recommendation. ECF No. 19 at 4-5.

1

who work at MCF-STW. *Id.* Hard is the Health Services Administrator and Stepney is a Corrections Program Director who supervises the mailroom. *Id.* Defendants Luke DeHaan and Stanley Quanbeck do not work for the DOC. *Id.* They are employed by Corizon, Inc., a private corporation that provides health-care services to inmates. ECF No. 21 at 2. DeHaan is a licenced physical therapist and Quanbeck is a physician. *Id.* DeHaan treated Rivera at MCF-SCL and MCF-STW. Quanbeck treated Rivera at MCF-STW.

In June 2012, Rivera sued all Defendants in their individual capacities under 42 U.S.C. § 1983. Rivera alleged that the Defendants denied him appropriate medical care in violation of his Eighth Amendment rights and were negligent in treating his serious medical needs. ECF No. 1.

**A. Rivera's Ulnar Nerve Dysfunction**

Rivera has a history of ulnar nerve dysfunction in both arms. Hoversten Aff. Ex. A at 12, ECF No. 77.[2] When Rivera arrived at MCF-SCL in March 2009, Nurse Kalla completed his intake evaluation. *Id.* At that time, Rivera complained of pain in his right arm and various other ailments. *Id.* Rivera informed Kalla that he was previously treated at Park Nicollet Clinic for problems with his right arm. *Id.* Nurse Kalla ordered Rivera's previous medical records from Park Nicollet and reviewed them on April 6. *Id.* The records did not reflect any history of orthopedic care for Rivera's right arm. *Id.*

Meanwhile, on March 24, Rivera consulted with physical therapist DeHaan. *Id.* at 56. Rivera reported that he began developing symptoms in his right arm about two years prior. *Id.* Rivera again reported that some tests were done on his right arm at a Park Nicolett Clinic when he first began

---

[2] Most documents filed by the Defendants in this case were filed under seal pursuant to a protective order.

experiencing symptoms. *Id.* Rivera reported that when evaluated at the Park Nicollet Clinic, he was informed that "he had involvement of the right ulnar nerve that needed to be surgically or conservatively addressed." *Id.* Rivera was apparently unable to follow-up with Park Nicolett staff since that appointment. *Id.*

After examination, PT DeHaan noted that Rivera had "genuine involvement of the ulnar nerve on the right side," but no obvious impairment in his activities of daily living. *Id.* PT DeHaan further noted that Rivera's condition could worsen and that "we will be anxious to get the records and see what the specialist's examination . . . revealed and what the suggested treatments were . . . ." *Id.* Rivera was instructed to follow-up with physical therapy once he received his prior medical records. *Id.* It was specifically noted that "[o]bviously, if the offender worsened rapidly or his transfer to the next facility is delayed[3], he will follow up with Health Services here . . . ." *Id.*

On April 20, Rivera consulted with Nurse Kalla again and reported that he was having trouble writing because his right hand was cramping. *Id.* at 12. He also indicated that he was experiencing "a lot" of nerve pain at night and that ibuprofen was not effectively relieving his pain. *Id.* Nurse Kalla worked with Rivera to identify which Park Nicollet clinic completed his orthopedic care in order to secure the appropriate medical records. *Id.* Nurse Kalla also instructed him to take 50 mg of Elavil each day for neuropathic pain. *Id.*

At the end of April, Nurse Kalla received a second set of Rivera's previous medical records from Park Nicollet. *Id.* at 13. She noted that Rivera saw a hand therapist a couple of times in 2005,

---

[3] At this time, the staff were aware that Rivera was scheduled to transfer from MCF-SCL to MCF-STW. The exact dates of the transfer, as originally scheduled, are not in the record.

but saw no record of an electromyogram (EMG)[4] on the right hand. *Id.* Nurse Kalla concluded that "[a]t this point, this is a non-emergent problem." *Id.* Nurse Kalla noted that Rivera could be treated at MCF-STW, after his scheduled transfer. *Id.* However, the transfer did not occur as originally scheduled. *Id.* In early August 2009, Rivera again sought medical attention from Nurse Kalla with complaints of ongoing pain in his right hand. *Id.* She noted that Rivera's atrophy seemed to have increased and directed him to physical therapy for another consultation. *Id.*

In mid-August, Rivera was again examined by PT DeHaan. *Id.* at 57. Rivera's symptoms had worsened. *Id.* DeHaan consulted with Nurse Kalla and they agreed that an EMG study of Rivera's right arm should be ordered. *Id.* An off-site consultation request form was sent on August 19 and the exam was conducted on August 31. *Id.* at 126. The EMG revealed severe right ulnar neuropathy and mild right median neuropathy at the wrist. *Id.* at 179. After reviewing the EMG results, both Nurse Kalla and PT DeHaan agreed that an off-site orthopedic consultation for possible surgery should be scheduled. *Id.* at 57. On October 2, 2009, Dr. Stephen Craane examined Rivera and recommended bracing his right arm for six weeks to see if his condition would improve without surgery. *Id.* at 129.

At some point prior to November 12, 2009, Rivera was transferred to MCF-STW. *Id.* at 58. During the month of November, Rivera consulted with PT DeHaan twice about the condition of his right arm. *Id.* Rivera felt that the brace was not working and that the condition of his hand and wrist was worsening. *Id.* Rivera expressed frustration that he was not allowed to see a specialist before trying the conservative brace treatment. *Id.* After examination, which suggested Rivera's condition had not improved, PT DeHaan referred Rivera "back to physician for reconsideration" and "to a

---

[4]   An electrodiagnostic technique for recording the exetal muscles at rest, during voluntary constrictions and during electrical stimulation. Dorland's Illustrated Medical Dictionary, 537 (28th ed. 1994).

specialist" for whatever procedures might be recommended. *Id.*

After an off-site consultation with Dr. Quanbeck at the end of November, Rivera saw orthopedic surgeon Dr. Andrew Thomas on December 21, 2009. *Id.* at 130. Dr. Thomas recommended immediate surgery to decompress the ulnar nerve at the elbow and hand. *Id.* at 181. He informed Rivera that "there was a low likelihood that he would recover much in the way of function of the muscles and sensory area innervated by the ulnar nerve," but that surgery now could help prevent further deterioration. *Id.* The next day Rivera was referred for surgery off-site. *Id.* at 232.

### 1. Rivera's January 2010 Surgery

On January 8, 2010, Dr. Thomas successfully performed a Gyuon's canal release and cubital tunnel release on Rivera's right arm. *Id.* at 182. Rivera was prescribed acetaminophen for pain and referred to physical therapy for post-operation exercises. *Id.* at 233. Rivera was scheduled for weekly therapy sessions to maximize his functional outcome. *Id.* at 59 and 234. At his first physical therapy appointment, Rivera was "visibly upset" because he understood his hand was likely permanently immobile. *Id.* at 59. PT DeHaan tried to comfort and encourage Rivera. He also informed Rivera that it could take months, if not years of hard work to regain functionality. *Id.*

After several weeks of therapy, Rivera realized signs of improvement in the functionality of his arm and hand. *Id.* at 60. Four months post-surgery, Dr. Thomas examined Rivera and observed full range of motion in the upper extremity. *Id.* at 190. He also noted "[u]nfortunately, there appears to be essentially no improvement with the distribution of the ulnar nerve." *Id.* Dr. Thomas hoped to see more improvement in 2-3 months. *Id.* Rivera consistently expressed disappointment about his functional ability for at least nine months following surgery. *Id.* at 59-64.

### 2. Rivera's April 2011 Surgery

In April 2011, after multiple consultations and various conservative treatments aimed at improving Rivera's functional capacity in his right hand, Rivera underwent a tendon transfer and a carpal tunnel release. *Id.* at 205. Dr. Thomas recommended this procedure because, although Rivera had "partial improvement" from the first surgery, the second procedure would "bolster the action of the intrinsic muscles and hopefully improve his clawing at the small finger and ring finger." *Id.* Rivera followed his post-surgery instructions and saw Dr. Thomas for a follow-up consultation in June. Dr. Thomas was pleased with Rivera's improvement in clawing and instructed him to begin work on active and passive range-of-motion exercises. *Id.* at 216. Toward the end of July, PT DeHaan noted that the outcome from surgery was "excellent" and that Rivera's range-of-motion in his fingers was "far better [than] before." *Id.* at 273.

Over the course of the next year, Rivera sought medical attention with complaints related to his right hand at least five times. *Id.* at 23, 69 and 25. Rivera's request for pain medications and other devices, like an elbow sleeve, were granted at these consultations. *Id.* In July 2012, one month after filing this motion, Rivera complained of severe pain in his right hand. *Id.* at 32. His hand was examined and an x-ray was taken. The x-ray showed no fracture, but some osteoarthritic changes in the interphalanageal joints were visible. *Id.* at 119. Toward the end of August, Rivera again saw PT DeHaan and reported that he could not open his hand "very quickly." *Id.* at 70. However, PT DeHaan noted that "later when gesturing with his hand, fingers seemed to move freely . . . ." *Id.*

### 3.     Other medical and mail delivery issues.

In April 2010, Rivera reported that he suffered from sinusitis. *Id.* at 14. When his condition did not improve after one month of treatment with Sudafed and a Nettie Pot, a water view x-ray was

6

ordered. *Id.* at 237. The June 2010 x-ray results showed normal sinuses. *Id.* at 113. In May 2011, Rivera made additional complaints about his sinuses. *Id.* at 24 and 253. Another x-ray was taken and the results were again normal. *Id.* at 117. Rivera also began complaining about fluid in his legs around February 2011. *Id.* at 18 and 242. Rivera was seen multiple times in 2011 and 2012 for these and other ailments. ECF No. 76 at 20-26. X-rays and other specialty tests were ordered and—when no diagnosis was obvious—Rivera was referred to a specialist. Hoversten Aff. Ex. A at 26 and 257, ECF No. 77.

On December 1, 2010 Dr. Thomas wrote to Rivera. Apparently, the letter was opened and first delivered to Health Services before it was delivered to Rivera. In response to a kite sent by Rivera about this letter, J.E. Lind wrote "Sorry we made the mistake and it will not happen again." ECF No. 90 at 15.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or establish "that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences drawn from it should be made in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. ANALYSIS

**A.  Rivera's Eighth Amendment claim against Defendant Kalla should be dismissed.**

Kalla argues that Rivera's Eighth Amendment claims against her should be dismissed because the allegations against her merely demonstrate that Rivera disagreed with the medical treatment he received. ECF No. 90 at 19. The Court agrees.

Demonstrating "deliberate indifference" toward the serious medical needs of inmates violates their right to be free from cruel and unusual punishment under the Eighth Amendment. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (holding that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment). However, plaintiffs who allege such a violation carry a difficult burden; they must show that (1) he or she suffered from an objectively serious medical need and (2) the prison officials knew of, but deliberately disregarded, that need. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

The Eighth Circuit defines a serious medical need as one that "has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). Further, deliberate indifference is "greater than gross negligence and requires more than mere disagreement with treatment decisions." *Gibson v. Weber*, 443 F.3d 642, 646 (8th Cir. 2006). As explained in *Long v. Nix*:

> [N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment. *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988).

> Prisoners do not have a constitutional right to any particular type of treatment. *Id.* at 327-28. Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment. *Taylor v. Turner*, 884 F.2d 1088, 1090 (8th Cir. 1989).

86 F.3d 761, 765 (8th Cir. 1996).

In this case, it is not disputed that Rivera's condition evolved into a serious ailment requiring surgery. ECF No. 77. However, the question in regard to Kalla—a nurse who provided primary care to Rivera when he arrived at MCF-SCL—is whether she was deliberately indifferent to Rivera's condition. The record demonstrates that she was not. *Id*. Kalla provided Rivera with appropriate and timely treatments. *Id.*

The gravamen of Rivera's claims against Kalla is that she made him wait seven months before allowing him to have surgery. ECF No. 106 at 5 ("7 months is to[o] long to wait for surgery when you left unattended poses a substantial risk of serious harm."). This allegation is baseless. Rivera's ulnar nerve condition was not determined to be likely in need of surgical repair until October 2009. ECF No. 77, Ex. A at 57. For the entirely of Rivera's stay at MCF-SCL, Kalla provided him with consistent treatment. *Id.* at 12-13. Kalla reviewed Rivera's file five days after his arrival and conducted his intake evaluation shortly thereafter, on March 19. *Id.* at 12. In response to Rivera's numerous complaints, Kalla ordered a physical therapy evaluation and an x-ray. *Id.* She also sought Rivera's orthopedic records from previous service providers. *Id.*

Rivera saw PT DeHaan later in March and met with Kalla in early April for a follow-up appointment. *Id.* at 56 and 12. DeHaan and Kalla agreed it was important to secure Rivera's previous medical records, particularly as it related to the condition of his hands and arms. *Id.* Kalla assisted Rivera in identifying the Park Nicollet clinic that previously treated him. *Id.* The records arrived at

9

MCF-SCL on April 30. *Id.* Based on Kalla's review of the medical records and her recent evaluations, she concluded that Rivera's condition was "non-emergent." *Id.* at 13. It appears that Rivera did not seek out medical attention from May – July 2009. ECF No. 77, Ex. A at 57.

Rivera saw Kalla again for treatment in early August. His condition appeared to have worsened, so she referred him to PT Dehaan for another evaluation. *Id.* at 13. At that time, it was agreed that an off-site EMG should be done on Kalla's arm. *Id.* at 57. The results were received in September and in October it was agreed that Rivera should consult with a surgeon. *Id.* Rivera has not submitted any evidence that suggests this determination should have been made earlier in the course of his treatment. ECF No. 106.[5]

The record supports the conclusion that from March – October 2009, Kalla provided Rivera with consistent medical treatment. The multitude of referrals made by Kalla demonstrates that she was not deliberately indifferent to Rivera's medical needs. For these reasons, Rivera's claim against Kalla cannot be construed as anything more than a disagreement about the type of treatment he received. An inmates disagreement about the treatment they receive does not give rise to a constitutional violation. *Gibson*, 443 F.3d at 646. As such, Rivera's Eighth Amendment claim against Kalla should be dismissed.

---

[5] This marks the end of Kalla's treatment of Rivera. Rivera was transferred from MCF-SCL to MCF-STW on October 13, 2009. ECF No. 93 at 9. As represented by the Defendants, it was Dr. Craane who—on October 2, 2009—recommended that the conservative brace treatment be utilized for six weeks to see if Rivera's condition would improve. ECF Nos. 90 at 12 and 76 at 6, citing ECF No. 77 at 129. Rivera has not alleged any claims against Dr. Craane. ECF No. 1.

**B. Rivera's section 1983 claims against Defendants Hard and Stepney should be dismissed.**

Defendants Hard and Stepney argue that Rivera has not alleged sufficient facts to maintain a section 1983 claim against them. ECF No. 90 at 16. Rivera contends that Hard failed in her responsibility to ensure that he received adequate medical care. ECF No. 106, 11-18. Similarly, he contends that Stepney failed in her responsibility to ensure he received his mail in a timely fashion. *Id.* 18-25. Because Rivera has not pled sufficient facts about how either Hard or Stepney *personally* violated his constitutional rights under the Eighth Amendment, his section 1983 claims against them should be dismissed.

Section 1983 imposes liability on state officials who, under the color of law, deprive citizens of any "rights, privileges, or immunities secured by" federal law. 42 U.S.C. § 1983. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (noting that section 1983 is not a source of substantive rights, but rather provides a method for vindicating federal rights conferred elsewhere). The doctrine of respondeat superior, however, does not apply to section 1983 actions. *Frentzel v. Boyer*, 297 Fed. Appx. 576, 577 (8th Cir. 2008). This means that supervisors cannot be held liable for the actions of subordinates unless it is proven that the supervisor's failure to properly supervise or train the offending employee "caused a deprivation of constitutional rights." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)).

Here, Rivera seeks to hold Hard and Stepney liable for actions that were allegedly taken by their subordinates or for decisions that they did not have the authority to override. ECF No. 106, 11-25. For example, Rivera argues that Hard was deliberately indifferent to his medical needs because, as the Health Services Administrator at MCF-STW, she did not timely refer him to a specialist. *Id.*

at 11. More specifically, Rivera alleges that Hard's agreement with the medical staff's recommendation that conservative treatments be utilized before scheduling an appointment with a specialist constitutes cruel and unusual punishment. *Id.* In sum, Rivera argues that Hard "does not just supervise the operations, she oversee[s] the whole health services, she is held liable for any and all misconduct of her action." *Id.* at 18. It is clear from Rivera's brief that he seeks to hold Hard liable for all actions taken by the medical staff at MCF-STW. Because Rivera fails to allege sufficient facts demonstrating that Hard's personal actions violated his constitutional rights, his Eighth Amendment claim against her should be dismissed.

Rivera's Eighth Amendment claim against Stepney fails for the same reason. Stepney is the mail room supervisor at MCF-STW. Rivera alleges that Stepney "maliciously and sadistically" denied him delivery of his medical mail to his cell. ECF No. 106 at 20. Specifically, "the failure of the defendant to take preventative action to curb the known pattern of denying government mail of plaintiff constituted deliberate indifference . . . ." *Id.* Issues related to mail delivery in prison do not give rise to a deliberate indifference claim under the Eighth Amendment. Regardless, as with Hard, Rivera does not allege that any action Stepney took personally violated his rights, and he fails to allege that Stepney was aware of any alleged misconduct by her staff. For these reasons, Rivera's Eighth Amendment claim against Stepney should be denied.

### C. Rivera's Eighth Amendment claim against PT DeHaan and Dr. Quanbeck should be dismissed.

Defendants DeHaan and Quanbeck argue that Rivera cannot establish an Eighth Amendment violation because the record demonstrates that they both provided Rivera with consistent medical care for his varied ailments. ECF No. 76. The Court agrees.

Rivera argues that PT DeHaan failed to act promptly in treating his ulnar nerve condition and

that Dr. Quanbeck contributed to the delay of his ulnar nerve surgery and mistreated his other ailments, including his sinus problem and fluid in his legs. ECF No. 110. In regard to PT DeHaan, Rivera claims that DeHaan should have immediately referred him to a surgeon upon his arrival at MCF-SLC in 2009 because DeHaan previously treated Rivera at the "Moore Lake facility" in 2000 and 2001. *Id.* at 2. This argument is nonsensical. The fact that PT DeHaan may have treated Rivera nearly a decade earlier does not support the conclusion that DeHaan should have immediately referred Rivera to a surgeon. The nature of Rivera's ulnar nerve ailment was such that the need for surgery was not immediately apparent. The Court is not aware of—and Rivera does not cite to—any professional medical standard that would condone immediate referral to a specialist for non-emergent ailments without analysis, consultation and the exhaustion of conservative treatment remedies. Once it was clear that Rivera's condition was serious and not improving with conservative treatments, DeHaan concluded that surgery was likely necessary and made an appropriate referral. *Id.* at 57. The record makes clear that PT DeHaan provided Rivera with consistent treatment before and after his ulnar nerve surgery. *Id.* at 56 - 58. For these reasons, Rivera has failed to establish that PT DeHaan was deliberately indifferent to his medical needs.

In regard to Dr. Quanbeck, Rivera's main argument is that he too deliberately delayed Rivera's ulnar nerve surgery. No evidence in the record supports this allegation. Rivera arrived at MCF-STW in November 2009. *Id.* at 58. Rivera was scheduled for surgery by December 2009. *Id.* at 181. Rivera argues that Quanbeck violated his rights because he was in need of surgery as early as March 2009. Again, this argument is without merit. As noted above, Rivera arrived at MCF-SCL in March 2009 and the staff, including PT DeHaan, appropriately analyzed, observed and treated Rivera's condition until it was clear that conservative treatments were insufficient. *Id.* The

conclusion that surgery was likely necessary was not made until October 2009. *Id.* at 57. Upon Rivera's arrival at MCF-STW, Dr. Quanbeck promptly and efficiently scheduled his off-site surgical consultation. *Id.* at 232.[6] Again, Rivera's argument can be summarized as a disagreement with the medical staff about the extent to which conservative treatments were utilized to treat his ulnar nerve disorder, and "[m]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995).

Further, the record does not support Rivera's allegation that Dr. Quanbeck deliberately disregarded other serious medical ailments that plague him, including his sinus issues and fluid in his legs. Rivera argues that "[a] doctor cannot just keep giv[ing] medication to the plaintiff if it is not working or helping his condition at all, the plaintiff requested to be seen by a specialist." ECF No. 110 at 7. The record demonstrates that Dr. Quanbeck treated Rivera consistently and did refer him to a specialist when he was unable to diagnose Rivera's ailments. *Id.* at 26 and 257.

For all of these reasons, Rivera's Eighth Amendment deliberate indifference claim against PT DeHaan and Dr. Quanbeck should be dismissed.

### D. Rivera's medical malpractice claim against the Defendants should be dismissed.

Finally, Rivera's medical malpractice claims against all Defendants should be dismissed. In Minnesota, a plaintiff may prove a *prima facie* case of medical malpractice by establishing (1) the

---

[6] Rivera alleges that Dr. Thomas stated that health services "waited too long" to send him for surgery. ECF No. 5 at 1. Rivera provides no documentation to support this allegation, but even if the statement is accurate, it does not establish that any of the defendants wantonly disregarded Rivera's condition.

standard of care recognized by the medical community as applicable to the particular defendant's conduct, (2) that the defendant in fact departed from the standard of care and (3) that the defendant's departure from the standard was a direct cause of the plaintiff's injuries. *Plutshack v. Univ. of Minn. Hosp.*, 316 N.W. 2d 1, 5 (Minn. 1982).

However, in 1986 the Minnesota legislature passed a law designed to reduce the number of medical malpractice nuisance suits. Minn. Stat. § 145.682. Specifically, the statute requires that plaintiffs who seek to bring a medical malpractice claim meet several requirements, including the attachment of an affidavit to his or her complaint stating that a qualified expert has reviewed the facts of the case and believes that the plaintiff's injuries indeed resulted from the medical professional's failure to abide by an established standard of care. Minn. Stat. § 145.682, Subd. 2 (1) and Subd. 3 (a). Then, 180 days after the suit is filed, the plaintiff must submit another affidavit (or an interrogatory response) that identifies the experts who will be called upon at trial, the facts and opinions as to which the expert(s) will testify and a summary of each expert(s) opinions. *Id.* at Subd. 4. *Wheatley v. Smith*, 2013 U.S. Dist. LEXIS 133369, *28 (D. Minn. June 25, 2013), *adopted by* LEXIS 132627, *2 (D. Minn. Sept. 16, 2013).

These affidavits are not necessary if the plaintiff can establish liability without expert testimony. *Id.* Subd. 2; *Anderson v. United States*, 2013 U.S. Dist. LEXIS 56812, *55 (D. Minn. January 25, 2013). Minnesota courts have held that "expert testimony is not necessary where the facts to be determined are within the common knowledge of the jury and where the results of surgical or medical treatment, viewed in the light of all the circumstances, provide a sufficient evidentiary basis to support an inference of negligence." *Baurer v. Friedlandi*, 394 N.W. 2d 549, 553 (Minn. Ct. App. 1986). If expert testimony is required to establish liability, the penalty for not complying with

15

the affidavit requirement is mandatory dismissal with prejudice. Minn. Stat. § 145.682, Subd. 6.

In this case, the Court concludes that Rivera cannot establish that any of the Defendants were negligent without expert testimony. Rivera did not comply with the expert affidavit requirement and therefore his medical malpractice claims must be dismissed in accordance with the statute. Minn. Stat. § 145.682, Subd. 6.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' motions for summary judgment (ECF Nos. 75 and 89) should be **GRANTED** in their entirety. Rivera's Eighth Amendment and medical negligence claims should be **dismissed with prejudice.**

DATED: January 29, 2014      *s/Franklin L. Noel*
                             FRANKLIN L. NOEL
                             United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 12, 2014**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by February 12, 2014 a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.